UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **KEIJU PU,** | )<br>)<br>) |
| **Plaintiff,** | )<br>) |
| vs. | ) No. 10-cv-3627<br>)<br>) **Judge Joan H. Lefkow** |
| **COLUMBIA COLLEGE CHICAGO,** | )<br>) |
| **Defendant.** | )<br>) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Keiju Pu ("Pu"), filed a five-count complaint against defendant, Columbia College Chicago ("Columbia"), alleging discrimination and retaliation in violation of the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. §§ 621 *et seq.* (counts I and II), the Americans with Disabilities Act ("the ADA"), 42 U.S.C. §§ 12101 *et seq.* (counts III and IV), and retaliation in violation of the Family and Medical Leave Act ("the FMLA"), 29 U.S.C. § 2601 *et seq.* (count V).[1] Presently before the court is Columbia's motion for summary

---

[1] In Illinois, an employee may sue under the ADEA or ADA only if she files a discrimination charge with the Equal Employment Opportunity Commission within 300 days of the "alleged unlawful employment practice." *Flannery* v. *Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004) (internal quotation marks omitted). Moreover, a plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge. *Teal* v. *Potter*, 559 F.3d 687, 691 (7th Cir. 2009); *see also Cheek* v. *W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) ("[B]ecause most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each of claim in her complaint."). Columbia admitted in its answer that Pu satisfied her exhaustion requirements and has not raised failure to exhaust administrative remedies as an affirmative defense. *See* Dkt. 8 at 2–3. Thus it has waived any argument that Pu failed to exhaust administrative remedies. *See Volovsek* v. *Wis. Dept. of Agr., Trade & Cons. Prot.*, 344 F.3d 680, 687 (7th Cir. 2003) ("[T]he timing and scope requirements of an EEOC filing are subject to various equitable doctrines-most significantly in the present case, waiver."); *Gibson* v. *West*, 201 F.3d 990, 993 (7th Cir. 2000) ("[A] failure to exhaust administrative remedies is not a jurisdictional flaw.").

judgment.[2] For the reasons that follow, Columbia's motion for summary judgment is granted with respect to count I, and denied with respect to counts II, III, IV, and V.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(e) & advisory committee notes (1963 amend.) While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## BACKGROUND[3]

Pu worked for Columbia in its IT department performing computer programing from 1996 until February 2009. During this time, Pu suffered from chronic interstitial lung disease, pulmonary hypertension, and Sjorgen's Syndrome. Pu was responsible for Microsoft Access ("Access") programming and development. From 2002 to 2003, her performance rating was excellent and from 2004 to 2007 her rating was "exceeds expectations." Bernadette McMahon,

---

[2] The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is appropriate in this district because all parties resides in this district and the events or omissions giving rise to the claim occurred in the district. 28 U.S.C. § 1391(b)(1) & (2).

[3] The facts in the background section are taken from the parties' Local Rule 56.1 statement of facts and construed in the light most favorable to Pu.

Columbia's Chief Information Officer, stated that Pu was the "most proficient [Microsoft] Access programmer at Columbia." Dorothy Dare, Pu's supervisor in August 2007 and Columbia's IT Director of User Support, also described Pu's work as "excellent." Beginning in November 2007, Pu's supervisor was Kathy Baker.

On August 2, 2007, Dare assigned Pu a project to compile a list of all continuing full-time students for the fall semester so that Columbia could identify those students to the Chicago Transit Authority ("CTA"). Pu initially produced a list that omitted the names of more than 600 students. Dare told Pu to fix the list and provided instructions on how to do so. Pu failed to adhere to Dare's instructions and sent the incorrect list to the CTA. Dare then had to intervene with the CTA to make sure that the incorrect list was not used. On August 8, 2007, Dare prepared a written notice of performance outlining deficiencies in Pu's work, which Pu states that she never received.

On or around August 31, 2007, Pu requested and received intermittent FMLA leave for her chronic medical conditions. Pu scheduled her leave from September 5 to September 13, 2007 and from September 17 to September 26, 2007. On September 24, 2007, Pu requested and received an extension of her FMLA leave until November 7, 2007, at which time she returned to work. Two weeks later, Columbia transferred Pu to a new position under the supervision of Baker. In her new position, Pu was responsible for developing Microsoft Sharepoint ("Sharepoint") applications, a program with which Pu had no previous experience. Columbia had previously decided to phase out its Access database, which was decentralized, and switch to an integrated intranet system using programs such as Sharepoint. Baker knew that Pu did not

3

have any Sharepoint experience and offered Sharepoint training including classes, books, and online courses.

On or around April 11, 2008, Baker submitted a performance evaluation for Pu. In that evaluation, Baker wrote that Pu had met or exceeded expectations in every category while noting that Pu was an "MS Access Pro" and had learned Sharepoint. That review additionally provided that "[b]y learning SharePoint, Keiju has responded effectively to changing demands in responsibilities." (Dkt. 39–6, at 4.) From April 2008 to October 2008, Pu continued working on Sharepoint projects. From October 12 to 17, 2008, Pu was on a medical leave of absence. On October 20, 2008, Pu returned to work and Baker assigned her seven projects to be completed by the end of the month. Pu described meeting the deadline as unrealistic but she worked overtime and completed the projects. During the same period, between October 21 and 28, 2008, Baker documented specific problems with Pu's work, which included providing information to a client without explanation, improperly changing field names, working slowly and failing to meet deadlines, failing to follow directions, and inability to understand Sharepoint.

On October 23, 2008, Baker issued a verbal warning to Pu about changing the names of a field in Sharepoint. On October 29, 2008, Baker prepared a written notice of performance in which she stated that Pu had not been able to master Sharepoint. The next day, on October 30, 2008, Baker met with Pu and delivered the October 29, 2008 written notice of performance and discussed issues with Pu's work performance and attitude. Around this time, Pu noted that Baker told her to stop taking advantage of Columbia's sick leave policy. On October 31, 2008, Baker issued Pu a written warning identifying five performance issues, four of which arose within the five day period preceding the write-up.

4

On November 3, 2008, Baker detailed the status of Pu's recent assignments and noted that several projects had not been completed and did not meet internal expectations or the client's instructions. That same day, Pu became ill and had severe breathing problems. The next day, Pu went to her doctor, who informed Pu that she needed to take a medical leave of absence from work. On November 4, 2008, Pu requested and received FMLA leave. Additionally, on November 4, 2008, Baker prepared a second written notice of performance that detailed additional performance deficiencies and mistakes. Baker also expressed frustration with Pu's decision to take additional leave.

Other Columbia employees that Baker supervised, including William Beasley, Steve Manning, and Anita Kapoor, made mistakes in building Sharepoint sites. None of these employees received written notices of performance. In addition, these employees did not have any medical issues. While on leave, on November 29, 2008, Pu sent a written complaint alleging discrimination against Baker based on Pu's age and chronic health condition. Patricia Olalde, Columbia's Director of Human Resources, interviewed several Columbia employees and prepared an investigation report concluding that Pu's claims of harassment and discrimination based on her age and chronic health condition were unsubstantiated.[4]

---

[4] Pu also contends that Columbia replaced her with a younger employee in 2007 after she took FMLA leave. In August 2007, Columbia hired Mervyn Sharaf, who was more than 30 years younger than Pu, as her backup. Olalde's report specifically found that Sharaf was not hired to replace Pu but was, rather, hired to provide user support assistance as Columbia phased out its use of Access. Sharaf's role was to serve as Pu's backup, which was not uncommon. Sharaf also did not develop Access applications. His role was to answer calls from end users and trouble-shoot issues.

On January 7, 2009, Pu filed a discrimination charge with the Equal Employment Opportunity Commission alleging, *inter alia*, age and disability discrimination and retaliation.[5] On January 22, 2009, Columbia received Pu's EEOC charge. A month later, on February 4, 2009, Pu returned to work and met with McMahon, Columbia's Chief Information Officer, and they discussed Pu's concerns and Columbia's new computer programs. Pu told McMahon that she found Baker to be "scary." McMahon explained that Columbia was in the process of transitioning to Sharepoint and was phasing out the use of Access. McMahon also explained Columbia's policy that developers, such as Pu, refrain from communicating with end users.[6]

After she returned to work, Pu worked on the SSD database project, which was an Access database. The completion date for the SSD project was February 27, 2009. There were pieces of information that Pu needed to obtain to complete the SSD project, which she could not obtain because of the policy precluding her communication with end users. Pu attempted to obtain this information from Baker to no avail. On February 12, 2009, Pu and Baker met with an end user and Pu installed a new version of the SSD application in short time period. The end user then added the data that Baker had wanted to Pu to input. The application worked and the user thanked Pu in front of Baker for her work.

---

[5] Pu's EEOC complaint identified four incidents of discrimination: (1) the hiring of Sharaf in August 2007 as her backup; (2) Pu's removal from her job as an Access programmer and developer after Sharaf was trained; (3) her assignment to Baker's group with the directive to learn Sharepoint; and (4) the issuance of the written notices of performance in a short period of time.

[6] The parties dispute whether other Columbia employees were allowed to communicate with end users. Pu argues that Columbia allowed William Beasley to communicate with end users. Columbia denies that Beasley communicated with end users regarding the development of Sharepoint applications. Rather, Beasley communicated with end users who wanted to build their own sites or needed trouble-shooting assistance in maintaining their sites.

During Pu's work on the SSD project during February 2009, Baker kept notes documenting Pu's performance deficiencies,[7] which Baker noted included insubordination, refusal to follow instructions, and failure to understand and complete the assignment. On February 16, 2009, Pu received a third written notice of performance based on her work with the SSD project and Baker met with Pu to discuss the notice. Baker was not a computer programmer and instructed Pu to enter data into the program when the program called for the end user to input that data.

On February 25, 2009, Pu filed another internal complaint with Columbia alleging discrimination and that Baker created a hostile work environment that exacerbated her chronic illness. On February 27, 2009, the SSD project's due date, Baker asked Pu if she had completed the SSD project and Pu responded that she had not. Baker then notified Pu that her employment at Columbia was terminated. At the time of Pu's discharge, Baker knew that Pu had filed internal complaints and an EEOC complaint and was aware that Pu took a leave of absence under the FMLA for her illnesses. Pu was 62 years-old at the time of her termination.

**ANALYSIS**

**I.      The ADEA and ADA Discrimination Claims (Counts I and III)**

Pu claims that Columbia discriminated against her in violation of the ADEA and ADA by unfairly disciplining her and ultimately terminating her employment. The ADEA prohibits employers from discriminating against employees who are 40 years old or older because of their age. 29 U.S.C. §§ 623(a)(1); 631(a). The ADA prohibits discrimination by an employer against

---

[7] Baker also documented the time that Pu arrived at work each morning, when Pu made phone calls, and the names of websites that Pu visited. Baker did not document other employees' work habits in the same manner.

an employee because of a disability. 42 U.S.C. § 12112(a). A plaintiff claiming ADEA or ADA discrimination can prove her case under the direct or indirect method of proof. *See Dickerson* v. *Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Van Antwerp* v. *City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010). Pu proceeds under the indirect method. Under *McDonnell Douglas Corporation* v. *Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), a plaintiff relying on the indirect method at summary judgment must show that (1) she was a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably. *Fleishman* v. *Continental Cas. Co.*, 698 F.3d 598, 609 (7th Cir. 2012); *Ptasznik* v. *St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the plaintiff makes this showing, the burden shifts to the defendant to provide a legitimate nondiscriminatory explanation for the termination. *Fleishman*, 698 F.3d at 609. The burden then shifts back to the plaintiff who must raise a question of fact regarding whether her termination was pretextual. *Id.* Columbia argues that Pu failed to meet her *prima facie* burden because Pu cannot show that she was meeting Columbia's legitimate expectations and she failed to identify other similarly situated employees outside of her protected class who were treated more favorably.[8]

### A. Whether Pu Was Meeting Columbia's Legitimate Expectations

---

[8] Columbia does not dispute that Pu was a member of a protected class under the ADEA or ADA. Pu was over 40 years old and suffered from a disability at the time of her termination. Nor does Columbia dispute that Pu suffered an adverse employment action. The only remaining elements under the indirect method of proof are whether Pu was meeting Columbia's legitimate employment expectations and whether other similarly situated employees outside the protected class were treated more favorably. The framework for establishing discrimination under these two elements is the same under the ADEA and ADA and the court will consider Pu's discrimination claims together.

Pu must establish that she was meeting Columbia's legitimate expectations at the time of the alleged discriminatory acts. *See Naik* v. *Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010). A court's inquiry into whether a plaintiff is meeting her employer's legitimate expectations is "more aptly characterized as simply *bona fide* expectations, for it is no business of a court in a discrimination case to decide whether an employer demands too much of [its] workers." *Robin* v. *Epso Eng. Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000) (internal citation and quotation marks omitted). The court's role is to determine whether an employee has met those expectations "so long as the employer's employment expectations are in good faith, without fraud or deceit[.]" *Id.* (internal citation, quotation marks, and brackets omitted).

Columbia argues that Pu's inability to learn Sharepoint, her insubordination, and failure to complete projects demonstrated that she was not meeting its legitimate employment expectations.[9] Columbia contends that Pu was unable and unwilling to learn Sharepoint even with extensive training. Pu, however, notes that in April 2008 Baker gave her an excellent review noting that Pu had learned Sharepoint. That Baker initially noted that Pu learned Sharepoint then later disciplined her for not understanding the program raises factual questions regarding whether Baker believed that Pu had sufficiently learned Sharepoint at the time of her termination. *See Brill* v. *Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir. 1997) ("[T]he question is

---

[9] Pu counters with evidence that she was a gold-medal computer programmer for Columbia for an 11-year period prior to the time that she began working for Baker. The relevant inquiry, however, is whether Pu was meeting Columbia's legitimate employment expectations at the time of her termination. *See Weber* v. *Univ. Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) ("[T]he plaintiff bears the burden of showing that she was meeting her employer's expectations *at the time* of the adverse action[.]") (emphasis in original); *Luckie* v. *Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("[T]he fact that [the plaintiff] may have met expectations in the past is irrelevant; she must show that she was meeting expectations at the time of her termination."). Baker's April 2008 review stating that Pu learned Sharepoint is relevant to whether she was meeting Columbia's employment expectations at the time of her termination because it contradicts Columbia's position that Pu never learned Sharepoint.

9

not whether the employer's performance ratings were *right* but whether the employer's description of its reasons is *honest*.") (internal quotations and brackets omitted) (emphasis in original).

Instead of resolving the issue, Baker's explanation that her April 2008 evaluation was incorrect and that she was trying to be encouraging raises more questions regarding the veracity of Columbia's position that Pu failed to learn Sharepoint. Columbia additionally contends that Pu was insubordinate and failed to follow instructions. Still, the allegations that Columbia relies upon to show insubordination and failure to follow instructions are based on Baker's appraisal of Pu's work rather than incidents of refusal to obey a directive or overt resistance to Baker. Baker's inconsistent reviews of Pu place her credibility squarely at issue and, as a witness's credibility is a factual question, *see Wilson* v. *AM Gen. Corp.*, 167 F.3d 1114, 1121 (7th Cir. 1999), the court concludes that whether Pu met Columbia's legitimate employment expectations is a question of fact that cannot be resolved at summary judgment. *Cf. Weeks* v. *Samsung Heavy Indus. Co.*, 126 F.3d 926, 933 (7th Cir. 1997) ("Because employment cases often turn on questions of intent and credibility, courts weighing summary judgment motions in these cases must take care not to invade the province of the factfinder by attempting to resolve swearing contests and the like.") (internal quotations marks omitted).

### B. Whether Columbia Treated Similarly Situated Employees More Favorably Than Pu

Pu must also identify similarly situated employees outside of her protected class that were treated more favorably. The similarly situated employee inquiry, which calls for a "flexible, common sense" approach, asks whether there are "enough common features between the individuals to allow a meaningful comparison[.]" *Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). While "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations," *Naik*, 627 F.3d at 600, they need not be "identical in every conceivable way." *Coleman* v. *Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). In order to show that these employees were similarly situated, Pu must demonstrate that they "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847 (internal quotation marks omitted). Pu contends that Baker supervised other non-disabled and substantially younger employees, William Beasley, Steve Manning, and Anita Kapoor, all of whom made mistakes with building Sharepoint.

#### i) ADEA Claim

As an initial matter, to prove her ADEA discrimination claim, Pu must show that similarly situated but substantially younger employees were treated more favorably. *See O'Connor* v. *Consol. Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996); *Fleishman*, 698 F.3d at 609; *Hartley* v. *Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) ("[W]e consider a ten-year difference in ages (between the plaintiff and her replacement) to be presumptively 'substantial' under *O'Connor*."). Pu does not provide the ages of Beasley,

11

Manning, or Kapoor.  Instead, Pu states only that Kapoor was 40-years-old at the time she was hired.  Thus, Pu cannot demonstrate that these employees are members of her protected class. *See*, *e.g.*, *Barricks* v. *Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) ("The record does not disclose the age of most of the other employees, so it is impossible to know whether or not they are members of her protected class.").  Pu cannot rely on Beasley, Manning, or Kapoor as similarly situated employees to establish her ADEA claim.

Pu additionally notes that Columbia treated a similarly situated, younger employee, Mervyn Sharaf, more favorably than she.  She points to the fact he was 30 years younger and that Columbia replaced her with Sharaf after she took FMLA leave in 2007.  In 2007, Columbia terminated Pu's position (not Pu herself) once it began the transition to Sharepoint.  Pu's contention that Sharaf replaced her after she returned from FMLA leave in 2007 is not borne out.  It is undisputed that, although Pu's position was eliminated during Columbia's transition to Sharepoint, Pu was not discharged.  Pu was reassigned to another position with expectations that she become proficient in Sharepoint.  Although Sharaf continued to work on Pu's Access database, Pu presented no evidence that Sharaf replaced her after her termination.  Sharaf is thus not a similarly situated employee upon whom Pu can rely to prove her age discrimination claim. Accordingly, Columbia is entitled to summary judgment as to count I.

      **ii)**     **ADA Claim**

With respect to Pu's ADA claim, Beasley, Manning, and Kapoor were non-disabled and thus were not a part of Pu's protected class.  Pu satisfied the first prong of the similarly situated employee test because Beasley, Manning, and Kapoor all reported to Baker.  Whether Pu satisfied the second prong presents a closer call as the evidence presented regarding these

employees' job responsibilities is slim. Pu does not identify Manning or Kapoor's titles. Besides reporting to Baker, the only similarity between Manning, Kapoor, and Pu was that they used Sharepoint and made mistakes with the program. This evidence is insufficient to show that Manning and Kapoor were similarly situated to Pu. *See Weber*, 621 F.3d at 594 (defendant entitled to summary judgment because the plaintiff failed to show that there were similarly situated men who were treated more favorably than the plaintiff); *Cracco* v. *Vitran Exp., Inc.*, 559 F.3d 625, 635 (7th Cir. 2009) ("Although [the plaintiff] states that no other employee at [the defendant] was ever terminated for the reasons that the [p]laintiff was allegedly terminated for, [the plaintiff] is not relieved of the responsibility to point to a similarly situated individual.") (internal citation and brackets omitted).

Pu has more evidence with regard to Beasley. Pu notes that Beasley was an IT employee who used Sharepoint and also made mistakes with the program. Baker never disciplined Beasley for making mistakes with Sharepoint. In addition, Beasley also communicated with end users about Sharepoint, something that Baker forbade Pu from doing. Columbia identifies distinguishing facts between Pu and Beasley (*i.e.*, that Pu failed to comply with project deadlines and was insubordinate) arguing that Pu's misconduct was more serious. While "[i]n a disparate discipline case, the similarly-situated inquiry often hinges on whether co-workers engaged in comparable rule or policy violations and received more lenient discipline[,]" *Coleman*, 667 F.3d at 850 (internal quotation marks omitted), here, the additional evidence of misconduct that Columbia relies upon to distinguish Pu from Beasley comes from Baker. As noted, Baker's explanations regarding Pu's workplace performance were inconsistent and raise credibility questions. At this juncture, the court will not credit Baker's explanations regarding Pu's job

performance to distinguish Pu from Beasley for purposes of the similarly situated employee analysis. The court thus finds that Pu sufficiently identified Beasley as a similarly situated employee who was treated more favorably than Pu and established a *prima facie* case of disability discrimination.

### C. Whether Columbia Had A Legitimate Nondiscriminatory Reason for Terminating Pu

Because Pu satisfied her *prima facie* case, the next question becomes whether Columbia had a legitimate, nondiscriminatory reason for firing Pu. *Fleishman*, 698 F.3d at 609. Pu's refusal to follow her supervisor's instructions in addition to insubordination substantiate Columbia's legitimate, nondiscriminatory reason for terminating Pu. *See Stringel* v. *Methodist Hosp. of Ind., Inc.*, 89 F.3d 415, 418 (7th Cir. 1996) (the defendants articulated insubordination as a legitimate, non-discriminatory reason for the plaintiff's termination). Because Columbia presented evidence showing that it had legitimate nondiscriminatory reason for terminating Pu, the burden shifts back to Pu to show that Columbia's given reasons were pretextual.

### D. Whether Pu Demonstrated that Columbia Acted with Pretext

To show pretext, Pu must demonstrate that Columbia's reasons for her termination were dishonest and that discriminatory intent was the underlying reason for her termination. *See Brown* v. *Ill. Dept. of Nat'l. Res.*, 499 F.3d 675, 683 (7th Cir. 2007). At bottom, Columbia contends that Pu's inability to meet its performance expectations was the nondiscriminatory reason justifying her termination. In cases like these, the pretextual inquiry blends together with whether Pu was meeting Columbia's legitimate employment expectations. *See Everroad* v. *Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010) ("In some cases, though, the issue of satisfactory performance and the question of pretext overlap. When the employer asserts as the

14

nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is as issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis."). As noted, however, questions of fact exist regarding whether Columbia's reason for terminating Pu (*i.e.*, poor job performance) was disingenuous. Accordingly, Columbia's motion for summary judgment as to count II is denied.

II.     **The ADEA, ADA, and FMLA Retaliation Claims (Counts II, IV, and V)**

Pu also claims that Columbia retaliated against her because of her age and disability and for taking medical leave in violation of the ADA, ADEA, and FMLA.[10] Pu can survive summary judgment on her retaliation claims by proceeding under the direct or indirect methods of proof. *See Goelzer* v. *Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010). Pu proceeds under the direct method and must show (1) a statutorily protected activity, (2) an adverse employment action, and (3) a causal connection between the two. *Leitgan* v. *Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011).

   A.     **FMLA Retaliation**

Pu argues that Columbia engaged in a pattern of retaliatory conduct beginning in 2007 after she first took FMLA leave. A week after Pu returned from FMLA leave (from October 12 to 20, 2008), Baker issued performance warnings. At that time, Baker told Pu to stop taking advantage of Columbia's sick leave policy. On November 4, 2008, after Pu requested FMLA leave, Baker issued Pu another performance warning and expressed frustration with Pu's

---

[10] The ADEA, ADA, and FMLA all protect an employee who is retaliated against by exercising her rights under each respective Act. *See* 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a); 29 U.S.C. § 2615(a)(2). Although Pu only addresses her FMLA retaliation claim in her response to Columbia's motion, the court will consider whether there is a question of fact that would preclude summary judgment on all of her retaliation claims.

decision to take leave. After Pu returned from FMLA leave on February 4, 2009, Baker began documenting minute details of Pu's day, including bathroom breaks and the time she arrived for work, which were things that she did not record for other employees. On February 27, 2009, Columbia terminated Pu's employment.

Pu must show that her decision to take FMLA leave[11] was a substantial or motivating factor in Columbia's decision to terminate her employment. *See Goelzer*, 604 F.3d at 995; *Lewis* v. *Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008) ("A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions.") (internal quotation marks omitted).[12] Pu can show this causal link either with a direct admission (*i.e.*, a smoking gun admission by Columbia that it terminated her employment because she took FMLA leave) or by means of circumstantial evidence to show unlawful retaliation. *See Pagel* v. *TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). "[C]ircumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent

---

[11] Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA also allows an employee to take intermittent leave or work on a reduced schedule when necessary because of a medical condition. *Id.* § 2612(b)(1).

[12] In *Gross* v. *FBL Financial Services, Incorporated*, 557 U.S. 167, 180, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009), the Supreme Court held that under the direct method of proof, "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." The Seventh Circuit has extended the rule in *Gross* to ADA claims, noting that "a plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability[.]" *Serwatka* v. *Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010). The Seventh Circuit, however, has not commented on whether the "but for" test applies to FMLA claims and one judge in this district has held that the proper test remains whether the employee's decision to take FMLA leave was a substantial or motivating factor. *See Lee* v. *Waukegan Hosp. Corp.*, No. 10 C 2956, 2011 WL 6028778, at *2 (N.D. Ill. Dec. 5, 2011) (Shadur, J.) ("*Lewis* has not been questioned by any post-*Gross* Seventh Circuit case, and this opinion will treat the 'motivating factor' standard as still applicable.").

16

can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Id*.

Because Pu has no direct evidence of unlawful retaliation, she relies on the latter approach highlighting a serious of alleged suspicious events that occurred shortly before her termination. The parties do not dispute that Pu engaged in a statutorily protected activity when taking FMLA leave nor do they contend that Pu's termination was an adverse employment action. *See Haywood* v. *Lucent Techs., Inc.*, 323 F.3d 524, 531–32 (7th Cir. 2003) (an employee's termination constitutes an adverse action). They, however, dispute the third prong of the test regarding whether Pu's decision to take FMLA leave resulted in her termination. Suspicious timing by itself cannot show a causal connection as "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *O'Leary* v. *Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). An adverse action, however, coming on the heels of a protected activity can raise the inference necessary to show causation. *E.g.*, *Loudermilk* v. *Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011).

Here, Baker negatively commented on Pu's taking FMLA leave in October 2008 and November 2008, and shortly after Pu went on FMLA leave in November 2008, she received another performance warning that criticized Pu for leaving work without completing her assignments. Columbia's decision to terminate Pu on February 27, 2009, less than one month after she returned from FMLA leave, coupled with negative repercussions Pu faced when taking prior leave raises a factual question as to whether Columbia retaliated against Pu. *See Pagel*, 695 F.3d at 631 (denying summary judgment on FMLA retaliation claim and holding that

17

"[a]lthough poor performance can certainly be a valid, non-discriminatory basis for [the plaintiff's] termination, a genuine issue of material fact remains as to whether this was the true reason for [the plaintiff's] termination."); *see also Magyar* v. *St. Joseph Reg. Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) ("This court has found a month short enough to reinforce an inference of retaliation."); *Hunt-Golliday* v. *Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir. 1997) (the plaintiff showed a "pattern of criticism and animosity by her supervisors following her protected activity" that supported the existence of the causal link). Accordingly, because Pu has carried her burden with respect to her FMLA retaliation claim, Columbia's motion for summary judgment is denied with respect to count V.

### B.   ADEA and ADA Retaliation

Under the direct method, Pu must show that her complaints alleging ADEA and ADA discrimination and retaliation were a but for cause regarding Columbia's decision to terminate her employment. *See Gross*, 557 U.S. at 180; *Fleishman*, 698 F.3d at 604; *Serwatka*, 591 F.3d at 962. The parties dispute whether there was a causal connection between Pu's complaints and her termination. Here, Pu filed an internal complaint on November 29, 2008, a complaint with the EEOC on January 7, 2009, and another internal complaint on February 25, 2009, all of which alleged age and disability discrimination. Also, during this period, Pu was on FMLA leave because of her chronic illness. On February 27, 2009, Columbia terminated Pu's employment.

The timing of Pu's termination coming just two days after her third complaint raises an inference that Columbia retaliated against Pu for making complaints alleging age and disability discrimination. *See Spiegla* v. *Hull*, 371 F.3d 928, 943 (7th Cir. 2004) (transfer came four days after the protected conduct); *McClendon* v. *Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997)

18

(2-3 day period sufficed). This inference is strengthened by Pu's declaration that, on February 12, 2009, she successfully installed a new version of the SSD program for an end user who thanked Pu for her work. Yet, approximately two weeks later, Columbia terminated Pu for failing to complete the SSD project. At a minimum, the suspicious timing plus evidence that Pu had satisfactorily used the SSD program shortly before her termination raise questions of fact precluding summary judgment. *See Culver* v. *Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("[A]n employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation."); *Payne* v. *Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied."). Accordingly, Columbia's motion for summary judgment with regard to counts III and IV is denied.

## CONCLUSION

Defendants' motion for summary judgment is granted with respect to counts I and denied with respect to counts II, III, IV, and V. This case will be called for a status hearing on April 11,

2013 at 8:30 a.m. The parties are directed to engage in a sincere effort to settle this case and to report the potential for settlement at the next status hearing and whether referral to the magistrate judge for a settlement conference would be helpful. A firm trial date will also be set.

Dated: March 20, 2013                    Enter: _____
                                                JOAN HUMPHREY LEFKOW
                                                United States District Judge
.